

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NB:JAM
F.# 2016R02202

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 14, 2019

<u>By ECF and Hand Delivery</u>

The Honorable Roslynn R. Mauskopf
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. George Gonzalez
       <u>Docket No. 17-CR-51 (RRM)</u>

Dear Judge Mauskopf:

    The government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for June 21, 2019. On March 16, 2019, the defendant pled guilty to Counts Two and Three of the above-captioned indictment, charging violations of 18 U.S.C. § 373(a), Soliciting a Crime of Violence, and 18 U.S.C. § 922(g)(8), Possession of a Firearm by a Person Subject to a Protective Order, respectively. The government estimates that the defendant's advisory sentencing range per the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to be 24-30 months. The defendant stipulated to this Guidelines range in a written plea agreement with the government. This is also the same range calculated by the Department of Probation in the Pre-Sentence Investigation Report ("PSR"). <u>See</u> PSR at ¶¶ 14-35. In his June 7, 2019 submission, ("Defendant's Submission"), the defendant recommends that the Court impose a sentence of 30 months.

    For the reasons set forth in the PSR and herein, the government recommends an above-Guidelines aggregate sentence of 120 months imprisonment. The Guidelines range is grossly insufficient to address (1) the seriousness of the defendant's conduct, (2) the defendant's flagrant disregard for the law and abuse of his position as a law enforcement officer, and (3) the need for specific and general deterrence. <u>See</u> 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C). Accordingly, the government recommends an upward variance, and asks that

the Court impose the maximum possible sentence on Count Two – 30 months – and impose a 90 month sentence on Count Three, with both sentences running consecutively.

As described below, the defendant, while working as a federal correctional officer, solicited an inmate under his supervision to facilitate the assault, torture and mutilation of his estranged wife – with whom the defendant was involved in Family Court litigation at the time – and her romantic partner. At the time of his arrest, the defendant was found in possession of two firearms and ammunition in violation of a Family Court order of protection.

The defendant's calculated and deceptive attempts to carry out acts of such extreme violence are simply not quantified by the Guidelines and require a far more severe incarceratory sentence.

## Factual Background[1]

The PSR accurately summarizes the offense conduct. See PSR at ¶¶ 3-9.

I.    The Defendant's Relationship History

As background, in or about 2015, the defendant and his wife ("Individual 1") were experiencing marital problems. Individual 1 has provided the government with text message communications between her and the defendant, which reflect their highly volatile relationship.

In or about January 2016, Individual 1 left New York and moved in with a romantic partner in Florida ("Individual 2"). The defendant travelled from New York to Florida, and on or about January 18, 2016, he confronted Individual 1 and Individual 2 at their West Palm Beach residence. The defendant unsuccessfully tried to persuade Individual 1 to return with him to New York and threatened to kill Individual 2 during the dispute. A 911 call was placed and the police responded, but no arrests were made and the defendant left the location. The government has interviewed both Individual 1 and Individual 2 about this incident, as well as one of the responding police officers.[2]

Later, in or about October 2016, the defendant and Individual 1 were involved in a domestic incident at their home in Staten Island, New York. The police responded, a

---

[1]    This proffer of facts – most of which are summarized in the PSR – is not a complete statement of all facts and evidence of which the government is aware. Where the contents of recordings, text messages or documents are summarized herein, they are done so in pertinent part and in sum and substance, unless otherwise indicated.

[2]    Notably, during the January 4, 2017 meeting with an undercover member of law enforcement, the defendant made reference to this trip to Florida, stating that he threatened a male individual, presumably referring to Individual 2.

Domestic Incident Report was completed,[3] and a temporary order of protection was issued by the Richmond County Family Court on or about October 10, 2016 ("the Order"). The Order prohibited, inter alia, the defendant from having any contact with Individual 1, including contact through third parties. The Order further required the defendant to surrender any firearms in his possession to the local police precinct. The Order was set to expire on or about January 26, 2017, after both the defendant and Individual 1 returned to Family Court.

## II. The Instant Offense Conduct

The government has provided the defendant with the audio and video recordings described below and can provide them to the Court if requested.

### A. Information Provided by the Confidential Source

In or about November 2016, the defendant, while working as a federal correctional officer at the Metropolitan Detention Center ("MDC"), approached an inmate ("the CS") under his supervision. The defendant approached the CS while the defendant was on duty, telling the CS that other inmates had "vouched" for the CS and asked if the CS would help the defendant find someone willing to do a "hit" for the defendant. In a subsequent conversation, the defendant asked the CS to provide him with the name and phone number of someone willing to "take the contract." The CS promptly reported these communications to law enforcement. In response, law enforcement provided the CS with a phone number to give to the defendant – this phone number was assigned to a cellular telephone utilized by a member of law enforcement acting in an undercover capacity ("UC1"). In or about December 2016, the CS provided UC1's telephone number to the defendant while the defendant was on duty at the MDC. The CS represented that the UC was a member of a violent street gang who would do the "job" the defendant requested.

### B. The December 20, 2016 Call

On or about December 20, 2016, the defendant called UC1 at the number the CS had provided. The defendant referenced his conversations with the CS, and that the CS said that UC1 could do a "job" for the defendant. UC1 stated that he would do so, but that he was in Florida, to which the defendant responded that the target was also located in Florida. The defendant repeatedly asked UC1 how much money UC1 expected to be paid. UC1 stated that he did not wish to speak in detail over the phone. UC1 informed the defendant that an associate in New York ("UC2") would meet with the defendant to establish the defendant's bona fides, after which UC1 would travel from Florida to New York to meet with the defendant personally.

---

[3] The Domestic Incident Report documented that Individual 1 reported the defendant having firearms at the residence.

C.  The December 23, 2016 Meeting

On or about December 23, 2016, UC2 met with the defendant in the vicinity of Sunset Park, Brooklyn.  During the meeting, the defendant provided UC2 with photographs of the intended targets – Individual 1 and Individual 2 – as well as their respective phone numbers, address and a description of their Florida residence.  The defendant stated that Individual 1 was currently in New York and that he wanted to "be sure" that Individual 1 and Individual 2 were present in Florida before the "job" was to take place.

The defendant further stated that "it should look like a robbery."  Payment was also discussed, with the defendant explaining that he would continue to "take care" of the CS in prison, that UC1 could steal whatever property was in the home, including "motorcycles and cars," and that the defendant would pay for UC1 to fly from Florida to New York to meet with the defendant.

The defendant stated that he did not want UC1 to kill anyone, but rather "beat them" and paralyze them so that they would "suffer…for the rest of their lives...that's how I do business."  The defendant stated that he wanted Individual 2 "dead" from the neck down, "no teeth, no nothing," and asked that UC1 "beat the shit out of [Individual 1]…I have no compassion for anybody."  When UC2 expressed concern that people would likely die as the result of such an assault, the defendant responded that there were "ways to do it," such as "taking a hammer to the spine," and suggesting that UC1 "pop" Individual 1's breast implants, saying "I want her to remember this."  The defendant also opined that he wished he could "pull [Individual 1's] dick off…cut it off" and recommended that UC1 "smash his shit [Individual 1's genitalia]" so that it would no longer function.  The defendant further stated that if Individual 1's son was home at the time of the assault, to "fuck him up too," and that "they [Individual 1 and Individual 2] may have a small dog now…you can kill that motherfucker too."

The defendant stated that he was "going through a divorce" and preferred UC1 do the "job" in February, after the defendant's court date with Individual 1.  The defendant stated that he would "do it himself," but had previously made a trip to Florida and confronted Individual 1 and Individual 2, after which the police responded.  The defendant claimed to have "done a lot of shit" while serving in the military.

At one point in the conversation, UC2 asked the defendant if he had "really thought about this" and asked "is this really what you want?" The defendant smiled and replied, "this is what I want."

The conversation ended with the defendant wishing UC2 a Merry Christmas.

### D.  Additional Phone Calls in December 2016

In a follow-up call between the defendant and UC1 on or about December 27, 2016, the defendant confirmed that he would like UC1 to do the "job" in February, as the defendant and Individual 1 had a pending Family Court date in late January.  UC1 and the defendant agreed to meet in New York the following week.

On or about December 29, 2016, the defendant called UC1 and discussed meeting in New York the following week.  UC1 informed the defendant that he would need to obtain firearms for the "job," again advised that it was possible that someone would be killed during the assault, and that payment and other details would be discussed in person.  The defendant also mentioned that he had other "jobs" for UC1, but that he wanted the "job" with Individual 1 and Individual 2 to be done first.

### E.  The January 4, 2017 Meeting

On or about January 4, 2017, the defendant met with both UC1 and UC2 outside of the MDC while the defendant was on duty.  During the meeting, the defendant agreed to pay $400 for UC1 to procure firearms and for UC2 to travel to Florida.  UC1 also stated that he had surveilled the house where Individual 1 and Individual 2 lived, and the defendant reiterated that the "job" should not be done until after the court date with Individual 1.  The defendant also provided UC1 with the name and pedigree information of another individual in Florida – a relative of Individual 1 – whose home UC1 could burglarize as partial payment for the first "job."

### F.  The Defendant's Arrest and Search of His Residence

On January 5, 2017, the defendant was arrested at his home in Staten Island.  A search warrant yielded, <u>inter alia</u>, the cellular telephone the defendant had used to communicate with UC1 and UC2, as well as two semi-automatic firearms – a Sig Sauer nine millimeter pistol and a Smith and Wesson .40 caliber pistol.  Ammunition for both weapons was also recovered.  The defendant was subject to the aforementioned Order and was prohibited from possessing any firearms.

### G.  The Defendant's Post-Arrest Statement

The defendant was advised of his <u>Miranda</u> rights and agreed to speak to law enforcement officers.  The statement was recorded.  The defendant conceded much of the above-described offense conduct, but indicated that several individuals – his colleagues and inmates at MDC – had approached the defendant about "taking care of" Individual 1 when the defendant's marital problems became known at the facility.  The defendant also claimed that only Individual 2 was supposed to be targeted, and that he did not intend to pay or provide any remuneration for the "job."

<u>Sentencing Range and Guidelines Calculation</u>

Count Two, Solicitation of a Crime of Violence, carries a maximum possible term of imprisonment of 30 months.  <u>See</u> 18 U.S.C. §§ 373(a) and 2261(b).  Count Three, Possession of a Firearm and Ammunition by a Person Subject to a Protective Order, carries a maximum possible term of imprisonment of 120 months imprisonment.  <u>See</u> 18 U.S.C. § 924(a)(2).  The sentences imposed on each count may run consecutively, resulting in a maximum possible cumulative sentence of 150 months imprisonment.

The government submits that the Guidelines calculation set forth below should be applied, which results in a total offense level of 17.  This level carries a range of imprisonment of 24 - 30 months, assuming that the defendant falls within Criminal History Category I.

<u>Count Two</u>

| | |
|---|---|
| Base Offense Level (§§ 2A6.2(a), 2X1.1)) | 18 |
| Plus:      Aggravating Factors (§ 2A6.2(b)(1)(A), (D), and (E)) | +4 |
| Adjustment for Solicitation (§ 2X1.1(b)(3)(A)) | -3 |
| Total: | <u>19</u> |

<u>Count Three</u>

| | |
|---|---|
| Base Offense Level (§2K2.1(a)(6)) | 14 |
| Total: | <u>14</u> |

| Grouping Analysis (§ 3D1.4): | Level | Units |
|---|---|---|
| Solicitation | 19 | 1 |
| Possession of a Firearm | 14 | .5 |
| Highest Offense Level: | 19 | |
| Adjustment for Multiple Units (§ 3D1.4(a)) | +1 | |
| Combined Adjusted Offense Level: | | <u>20</u> |
| Adjustment for Acceptance of Responsibility | | -3 |
| **Total Offense Level:** | | **<u>17</u>** |

6

The defendant stipulated to the aforementioned Guidelines calculation in a written plea agreement with the government, and the PSR reaches the same Total Offense Level in its calculation. See PSR at ¶¶ 14-35.

## Factors Warranting an Above-Guidelines Sentence

As noted in the PSR, several factors militate in favor of a substantial upward departure. See PSR at ¶ 94. As the same factors also weigh in favor of the upward variance advocated by the government herein, they are discussed concurrently below. See generally Gall v. United States, 522 U.S. 38 (2007) (variance outside the Guidelines range should occur after consideration of all relevant departure provisions); United States v. Chase, 560 F.3d 828 (8th Cir. 2009) (departure precedents do not bind district courts with respect to variance decisions, but may be considered persuasive authority); United States v. McIntyre, 531 F.3d 481 (7th Cir. 2008) (post-Booker, district courts need not follow § 4A1.3 when imposing an above-guidelines sentence, but must provide a statement of reasons consistent with section 3553(a)).

First, the government and the PSR declined to apply a two-point enhancement for abuse of a position of trust. See U.S.S.G. § 3B1.3. "Public trust" refers to a position "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." Id at Application Note 1. The Guidelines note that "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." Id. While the defendant's supervisory position over MDC inmates may not have "significantly facilitated the commission of the offense" in such a way as to trigger this enhancement, his role as a correctional officer is a significant factor that the Court should consider as grounds for an upward variance when conducting its analysis pursuant to 18 U.S.C. § 3553(a). Id.

More generally, the Guidelines only account for the solicitation to commit an act of violence against a single victim – Individual 1 – and do not account for the fact that Individual 2 was also a target, and that Individual 2's son and dog would also be harmed if they had been present. See PSR at ¶ 94. Additionally, the Guidelines do not factor in that burglarizing another home – an entirely separate criminal act – was suggested by the defendant as partial payment for the "job" targeting Individuals 1 and 2. Id.

Nor do the Guidelines fully capture the seriousness of the offense, in that the violence solicited by the defendant could have very easily resulted in the deaths of at least two people. See PSR at ¶ 94. It is worth noting that, but for the defendant's insistence that Individual 1 and Individual 2 be left alive to "suffer" (thus negating the specific intent required by the federal murder-for-hire statute, 18 U.S.C. § 1958), the defendant would have faced a minimum base offense level of 33 and a Guidelines range of 135-168 months, which exceeds the maximum possible consecutive sentence on the instant charges. See generally U.S.S.G. §

2A1.5. Given the heinous violence the defendant sought to inflict, this distinction – which greatly impacts the offense charged and his Guidelines – is trivial.[4]

Indeed, the defendant actually receives a benefit in his Guidelines calculation due to the fact that the predicate offense he solicited was never consummated. See PSR at ¶ 94. Of course, this was because the CS reported the defendant's overtures to law enforcement, and the individuals the defendant ultimately solicited were undercover agents. Thus, the fact that his plan did not materialize is not to the defendant's credit, and the three-point downward adjustment is therefore baseless.

## Argument

In this case, the government's recommended above-Guidelines aggregate sentence of 120 months imprisonment is warranted to address (1) the seriousness of the defendant's conduct, (2) the defendant's disregard for the law and abuse of his position as a law enforcement officer, and (3) the need for specific and general deterrence. See 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

### A. The Seriousness of the Offense Mandates a Substantial Upward Variance

It is difficult to overstate the severity of the defendant's conduct in this case. He solicited individuals that he thought were violent gang members to execute an armed home invasion. He specifically requested that the occupants and intended victims be beaten, tortured and disfigured in such grotesque ways so as to cause paralysis and other lifetime injuries. His motive for doing so seems to be driven purely by a desire for revenge and retribution for perceived slights during his relationship with Individual 1. As described in the Defendant's Submission, while the defendant's relationship with Individual 1 appears to always have been turbulent, the offense conduct represents a dramatic escalation of an already volatile situation. See, e.g., United States v. Seay, 553 F.3d 732 (4th Cir. 2009) (affirming upward five-level variance from 46 to 57 months to 96 months, based in part on the need to protect the public from further crimes of the defendant, and referencing the district court's finding that the defendant "had become increasingly dangerous over the years, progressing from possessing a knife to possessing a gun in connection with his stalking practices"). An upward variance is justified on these grounds alone.

Nor is this a situation where the defendant was ensnared by overzealous members of law enforcement – the defendant initiated the offense conduct at every opportunity and juncture, he took multiple affirmative steps over a significant period of time, and he

---

[4]    Also by way of comparison, had the defendant been charged with attempting to commit a single B violent felony offense in New York (e.g., Assault in the First Degree, Burglary in the First Degree, Robbery in the First Degree, etc.), the defendant would face a minimum possible determinate sentence of 3.5 years and a maximum possible determinate sentence of 15 years imprisonment.

attempted to time the offense after his Family Court matter had concluded. Even when he was advised that the requested "job" could easily result in death, he persisted. To be sure, but for the CS reporting the defendant's solicitation and the quick response by law enforcement, numerous lives could have very easily been lost.

Making the defendant's conduct even more brazen is the fact that he used his position as a federal correctional officer to facilitate the offense. Entrusted to supervise inmates and enforce the rules of a correctional facility, the defendant instead used his position to network with individuals he knew had criminal proclivities, encouraging them to reoffend by assisting in the defendant's violent endeavor. The defendant's willingness to conspire with a federal inmate is beyond egregious and shows a complete disregard for the law that is simply not contemplated by the Guidelines. Similarly, the defendant's possession of firearms when he was prohibited from doing so is even more disturbing given his military background and position as a law enforcement officer at the time of the offense.

To impose a Guidelines sentence and simply dismiss this offense conduct as aberrational or as the result of the defendant's psychological issues would ignore its severity, cunning and violence, as well as undermine respect for the law.

B.    The Defendant's Background Provides Mitigation, But Does Not Support a Guidelines Sentence

The defendant's military record, medical history and otherwise law-abiding life should certainly be considered, but they must also be balanced with the nature and gravity of the instant offense. See PSR at ¶¶ 42-74. While the defendant's service record is commendable, the Defendant's Submission, while noting the various awards received during the defendant's career, offers no explanation for why he was discharged "honorably" albeit with "unsatisfactory performance." The PSR is also silent on this issue, noting that "the specific commendations/awards reported by the defendant have not been independently verified." See PSR at ¶¶ 66-7, 93. See also U.S.S.G. § 5H1.11 (noting that "[m]ilitary, civic, charitable, or public service…and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range"); United States v. Gaines, 295 F.3d 293 (2d Cir. 2002) ("[o]nly if a defendant's conduct was so extraordinary that it falls outside of the heartland of cases covered by the guidelines would a downward departure be warranted"); United States v. Peters, 978 F.2d 166 (5th Cir. 1992) (defendant's military service and receipt of two purple hearts and distinguished flying cross did not compel downward departure from Guidelines in sentencing him on conviction of conspiring to illegally export helicopters that could be used for military purposes).

With respect to his physical and mental condition, the government does not doubt the existence or severity of the defendant's ailments. However, it should be clear that he did not serve in a combat situation during his military tenure, and thus his condition should not be mistaken for or conflated with the myriad of physical, psychological and emotional challenges commonly faced by servicemen returning from warzones. Instead, the Defendant's Submission cites the defendant's "volunteer efforts on 9/11" as the source of his "[post-

traumatic stress disorder] and insomnia." While the government has no independent basis to doubt this assertion, it is peculiar that, despite the exhaustive nature of the Defendant's Submission and accompanying attachments, only four uncorroborated sentences are devoted to this topic.[5] See Defendant's Submission at Page 16.

These omissions regarding the defendant's "unsatisfactory" departure from the military and the purported source of his PTSD are not inconsequential and should be considered. Nevertheless, while the defendant's background provides compelling mitigation, they do not warrant a Guidelines sentence in this context. The factors in favor of a substantial upward variance are far more significant.

C.     The Need for Both Specific and General Deterrence is High

A substantial sentence is necessary to deter not only the defendant, but similarly-situated individuals from engaging in such behavior. Because the instant offense involved "rational, cool, and calculated" decision making, rather than "sudden crimes of passion or opportunity, [it is a] prime candidate for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). The defendant engaged in deliberate, premeditated conduct, making the instant offense ideal for both general and specific deterrence.

Additionally, a heavy sentence is necessary to deter others who would abuse their official position for their own personal ends. The defendant's sentence must clearly communicate that such abuses will not be tolerated.

Furthermore, to sentence the defendant within the Guidelines would actually embolden those who wish to solicit violence and inflict catastrophic harm on others. As stated previously, the defendant's wish that his prospective victims survive the attack to "suffer" takes the instant conduct outside the ambit of the federal murder-for-hire statute and its substantially greater sentencing parameters. Thus, absent a considerable upward variance in this case, the defendant's conduct would provide a blueprint to those who would solicit violence: simply affirmatively deny the specific intent to kill and the potential consequences may be far less onerous. Accordingly, a Guidelines sentence would encourage, rather than

---

[5]     The entirety of the explanation in the Defendant's Submission is as follows: "[h]is PTSD and insomnia stem from his volunteer efforts on 9/11. Mr. Gonzalez was in lower Manhattan that day and witnessed the tragedy unfold. While most people were running away from the towers, he ran towards them. He stayed on site for four days sifting through the rubble, rescuing survivors, and digging out bodies. While he believes it was his duty to act in that moment, he remains haunted by the macabre images of gore and pain he confronted." Defendant's Submission at Page 16. While the therapy records provided by the defendant do reference "9/11 trauma" as the cause of the defendant's PTSD, such notations are in a conclusory fashion and without any explanation. See generally, Defendant's Submission, Exhibit H (Redacted Counseling Records).

deter, similar behavior in the future. The Court must therefore apply an upward variance to ensure a sufficient deterrent message is sent.

     D.     The Proposed Upward Variance Would Not Be an Abuse of Discretion

A 120-month sentence would not be an abuse of the Court's discretion at sentencing. The substantive reasonableness of any sentence – whether within or outside the Guidelines – is reviewable under an abuse-of-discretion standard. See Gall v. United States, 522 U.S. at 59 (2007) (noting that "if the sentence is within the Guidelines range, the appellate court may, but is not required to, apply a presumption of reasonableness…. but if the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness"). Indeed, the Court has tremendous latitude in fashioning a just sentence, and deference is given to any "decision that the § 3553(a) factors, on a whole, justify the extent of the variance." Id ("[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court").

Here, given the case-specific factors outlined above, the recommended 120-month sentence is well within the Court's broad discretion. See, e.g., United States v. Erpenbeck, 532 F.3d 423 (6th Cir. 2002), certiorari denied 555 U.S. 997 (sentence of two concurrent terms of 300 and 60 months for bank fraud and obstruction of justice convictions, which represented an upward variance of 65 months from the Guidelines range, was not substantively unreasonable; district judge explained that an above Guidelines sentence was proper in light of the fact that the suffering and harm was not otherwise accounted for in defendant's sentencing); United States v. Mills, 917 F.3d 324 (4th Cir. 2019) (district court's application of statutory sentencing factors supported its conclusion that variance to 70-month sentence – almost double the estimated Guidelines – for being felon in possession of firearm was necessary to satisfy basic aims of sentencing. Court considered the defendant's criminal history and particularly dangerous nature of circumstances involved in the charged offense); United States v. Martinez-Armestica, 846 F.3d 436 (1st Cir 2017), certiorari denied 138 S.Ct. 64 (upward variance of 25 months not substantively unreasonable where district court considered statutory sentencing factors to distinguish defendant from ordinary brandisher of firearm); United States v. Lente, 759 F.3d 1149 (10th Cir 2014) (district court's decision to vary upward from defendant's 46-57 month advisory Guidelines range and impose a 192-month sentence for involuntary manslaughter and assault resulting in serious bodily injury was substantively reasonable given the extreme recklessness of the act and resulting death). Considering the totality of the circumstances delineated in 18 U.SC. § 3553(a), the proposed upward variance is well within the range of "permissible decisions." United States v. Ingram, 721 F.3d 35, 43 (2d Cir. 2013) (when reviewing sentence for substantive reasonableness, Court of Appeals will not substitute its own judgment for district court on the question of what is sufficient to meet statutory sentencing considerations in any particular case, but will instead set aside district court's substantive determination only in exceptional cases in which district court's decision cannot be located within the range of permissible decisions).

<u>Conclusion</u>

For the reasons set forth in the PSR and herein, the government recommends an upward variance and an above-Guidelines aggregate sentence of 120 months imprisonment. The Guidelines simply do not quantify or capture the gravity, scope and shocking nature of the offense conduct. Accordingly, the government recommends the Court impose the maximum possible sentence on Count Two – 30 months – and impose a 90 month sentence on Count Three, with both sentences running consecutively. This sentence is sufficient, but not greater than necessary to achieve the goals of sentencing, <u>see</u> 18 U.SC. § 3553(a)(2).

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:     /s/ _____
        Artie McConnell
        Assistant U.S. Attorneys
        631-715-7825

cc:     Edward V Sappone, Esq. (by ECF)
        Jennifer G. Fisher, United States Probation Officer (by E-mail)